Slip Op. 15-135

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MERIDIAN PRODUCTS, LLC,**<br><br>    Plaintiff,<br><br>and<br><br>**WHIRLPOOL CORPORATION**<br><br>    Plaintiff-Intervenor<br><br>v.<br><br>**UNITED STATES**,<br><br>    Defendant,<br><br>and<br><br>**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**<br><br>    Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge<br><br>Court No. 13-00246 |

**OPINION AND ORDER**

[Affirming in part, and remanding in part, a final scope ruling of the International Trade Administration, U.S. Department of Commerce, interpreting the scope of antidumping and countervailing duty orders on certain aluminum extrusions from the People's Republic of China]

Dated: December 7, 2015

*Daniel J. Cannistra*, Crowell & Moring, LLP, of Washington, D.C., for plaintiff. With him on the brief was *Alexander Schaefer*.

*Donald Harrison*, Gibson, Dunn & Crutcher, LLP, of Washington, D.C., for plaintiff-intervenor.

*Tara K. Hogan*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Jessica M. Link*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor.

Stanceu, Chief Judge: Plaintiff Meridian Products, LLC ("Meridian") contests a 2013 "Final Scope Ruling" in which the International Trade Administration, United States Department of Commerce ("Commerce" or "the Department") construed the scope of antidumping and countervailing duty orders (the "Orders") on aluminum extrusions from the People's Republic of China ("China" or the "PRC") to include three types of kitchen appliance door handles.

Before the court is Meridian's motion for judgment on the agency record, in which Meridian argues that the Final Scope Ruling is contrary to law and that Commerce should have excluded all three types of door handles from the scope of the Orders. Defendant and defendant-intervenor Aluminum Extrusions Fair Trade Committee, a trade association of U.S. producers of aluminum extrusions and a petitioner in the antidumping and countervailing duty investigations, oppose plaintiff's motion. The court affirms the Department's determinations as to two of the product types. The court remands the Final Scope Ruling for reconsideration as to the third, concluding that Commerce did not base this determination on a reasonable interpretation of the scope language of the Orders.

## I. BACKGROUND

Commerce issued the antidumping and countervailing duty orders on aluminum extrusions from China in May 2011. *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Int'l Trade Admin. May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Int'l Trade Admin. May 26, 2011) ("*CVD Order*"). Meridian filed with Commerce a request for a scope ruling ("Scope Ruling Request") on January 11, 2013, in which it sought a ruling excluding from the scope of the Orders the three types of appliance door

handles.  *Letter Requesting a Scope Ruling Regarding Kitchen Appliance Door Handles* (Jan. 11, 2013) (Admin.R.Doc. No. 1) ("*Scope Ruling Request*").  After conducting an administrative proceeding, Commerce issued the Final Scope Ruling on June 21, 2013, in which it ruled that all three types of appliance door handles are within the scope of the Orders.  *Final Scope Ruling on Meridian Kitchen Appliance Door Handles*, C-570-968, A-570-967 (June 21, 2013) (Admin.R.Doc. No. 34), *available at* http://enforcement.trade.gov/download/prc-ae/scope/32-Meridian-kitchen-door-handles-21jun13.pdf (last visited ___) ("*Final Scope Ruling*").

Meredian commenced this action on July 10, 2013.  Summons, ECF No. 1; Compl., ECF No. 4.  Prior to any briefing of substantive issues, Meridan filed a motion for an expedited remand on Sepetember 23, 2013.  Meridian's Mot. Remand, ECF No. 29.  On February 19, 2014, the court denied this motion on the ground that an expedited proceeding such as that proposed by plaintiff would prejudice the other parties to the action.  *Meridian Products LLC v. United States*, 38 CIT __, Slip. Op. 14-20 (Feb. 19, 2014).  On May 12, 2014, Meridian filed its motion for judgment on the agency record.  Pl.'s Mot. J. Agency R., ECF No. 38 ("Pl.'s Br.").[1]  Defendant and defendant-intervenor responded on September 9, 2014.  Def.'s Opp'n to Pl.'s Mot. J. Agency R., ECF No. 46 ("Def.'s Opp'n"); Def.-Int.'s Resp. Pl.'s Mot. J. Agency R., ECF No. 45 ("Def.-Int.'s Opp'n").  On October 14, 2014, Meridian filed a reply.  Pl.'s Reply Br. to Def.'s Opp'n to Pl.'s Mot. J. Agency R., ECF No. 48 ("Pl.'s Reply").  The court held oral argument on February 12, 2015.  ECF No. 60.

---

[1] Plaintiff-intevenor Whirlpool Corporation has not submitted briefing in this litigation.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over civil actions brought under section 516A of the Tariff Act of 1930 ("Tariff Act").[2]  19 U.S.C. § 1516a(a)(2)(B)(vi). Section 516A provides for judicial review of a determination of "whether a particular type of merchandise is within the class or kind of merchandise described in an . . . antidumping or countervailing duty order." *Id*.  In conducting the review, the court must set aside "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1)(B)(i).

### B. Description of the Merchandise in Meridian's Scope Ruling Request

Meridian's Scope Ruling Request specified that each of the three types of appliance door handles at issue contains extruded aluminum of "6063-T5 material." *Scope Ruling Request* 2. Commerce determined in the Final Scope Ruling, and plaintiff does not contest, that this is a "6000 series aluminum alloy" that is among those identified by the scope language of the Orders. *See Final Scope Ruling* 12.

According to the Scope Ruling Request, "[t]he Type A handles" are "finished handles" that "are for oven door assemblies." *Scope Ruling Request* 2.  They "have a radius arc and distinctive bow tie look" and "are brushed and anodized with mounting hole area that fits over a shoulder bolt on the oven doors." *Id*.

Type B handles are also for "oven door assemblies." *Id*.  The Scope Ruling Request described a Type B handle as "an assembly of the middle handle bar extrusion piece plus two

---

[2] All statutory citations herein are to the 2012 edition of the United States Code and all regulatory citations herein are to the 2012 edition of the Code of Federal Regulations.

plastic injection molded end caps at each end." *Id.*  It added that "[t]he end caps are attached at each end of the handle to serve as the finished end and the mechanism for attaching to the oven door" and that "[h]oles are drilled and aligned to match the door holes on the oven door for final assembly." *Id*.

The "Type C Handle Kit" is "a boxed consumer-installed freezer handle kits [*sic*]" that "contain one handle, one allen wrench, and installation instructions." *Id.* "The handle . . . has an arc radius and drilled holes on the back to match the door holes for assembly" and "has the appearance of a bow tie." *Id*.

The Scope Ruling Request further provided that "[a]ll of the components are fully fabricated and do not require further cutting, punching, or other processing prior to their assembly and installation to the finished oven, refrigerator, or freezer unit." *Id*. at 3.  It also stated that "the kitchen appliance door handles are in a form ready to be sold directly to, and used by, the consumer/end-user," that "[t]he package contains the components such as bottom mount fasteners and allen wrench necessary for installation by the consumer," and that "the handle kit is shipped to the customer with assembly instructions." *Id*. at 3-4.

## C.  The Scope Language in the Orders

The scope language of the antidumping duty order and the scope language of the countervailing duty order are essentially identical.  The Orders apply to "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,653.  The scope includes aluminum extrusions that are "anodized" and also includes aluminum extrusions that are "fabricated (i.e., prepared for assembly)" by "operations" that

"would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, strectched, knurled, swedged, mitered, chamfered, threaded, and spun." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654. The scope also includes such aluminum extrusions even if they are "described at the time of importation as parts for final finished products that are assembled after importation . . ." or "identified with reference to their end use . . . ." *AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,654.

The scope language contains an exclusion applying to certain "finished merchandise," which reads as follows:

> The scope . . . excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels.

*AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654. The scope language also contains an exclusion for "finished good kits," as follows:

> The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, *etc*. in the packaging with an aluminum extrusion product.

*AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

### D. The Court Affirms the Department's Determination that the Type A and Type C Appliance Door Handles Are Within the Scope of the Orders

The Court of Appeals for the Federal Circuit has instructed that "just as orders cannot be extended to *include* merchandise that is not within the scope of the order as reasonably interpreted, merchandise facially covered by an order may not be *excluded* from the scope of the order unless the order can reasonably be interpreted so as to exclude it." *Mid Continent Nail*

*Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (emphasis in original). In this case, the Type A and Type C appliance handles are facially covered by the scope language, which cannot reasonably be interpreted to exclude them. As shown by Meridian's Scope Ruling Request, each Type A and each Type C handle is produced by fabrication that is performed on an extrusion consisting of an aluminum alloy covered by the Orders. *Scope Ruling Request* 2. The general scope language, i.e., the language not including the exclusions, therefore describes these two handle types, and no exclusion within the scope language applies to either of them.

The finished merchandise exclusion does not describe the Type A or Type C handles. By its plain terms, this exclusion is limited to assemblies: it pertains only to "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654. As the Scope Ruling Request concedes, the Type A and Type C appliance door handles are one-piece articles, not assemblies of parts. *See Scope Ruling Request* 2. The aluminum extrusion is not a "part" of a Type A or Type C handle and instead is the entire article.

The finished goods kit exclusion is also inapplicable to the Type A and Type C handles. This exclusion applies only to articles imported unassembled in the form of a kit containing all parts necessary to assemble the completed good. *See AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654. The Type A handles are imported as completed articles. *See Scope Ruling Request* 2. Although the Scope Ruling Request describes a "Type C Handle Kit," *id.*, it clarifies that the Type C handles, like the Type A handles, are imported in finished form. *Id.* ("The kits contain one handle, one allen wrench, and installation instructions.").

In contesting the Final Scope Ruling, plaintiff raises arguments directed to the Final Scope Ruling as a whole. As applied to the Type A and Type C handles, these arguments are unconvincing.

Relying on § 351.225(k) of the Department's regulations (19 C.F.R. § 351.225(k)) and *Walgreen Co. v. United States*, 620 F.3d 1350, 1352 (Fed. Cir. 2010), Meridian argues that "the initiation of a formal scope inquiry reflects a judgment that the (k)(1) criteria are not dispositive" and that "the regulations further state that when the (k)(1) criteria are not dispositive, Commerce *must* consider the criteria in paragraph (k)(2)." Pl.'s Br. 5 (emphasis in original). This argument is unavailing. Having crafted scope language that cannot reasonably be interpreted to exclude the Type A and Type C handles, Commerce lacked the authority to place these two handle types outside the scope of the Orders. Neither the holding of *Walgreen Co*. nor 19 C.F.R. § 351.225(k) requires a contrary result. Moreover, although § 351.225(e) provides that the Secretary will initiate a scope inquiry "[i]f the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section," 19 C.F.R. § 351.225(e), it does not necessarily follow that, having initiated a scope inquiry, Commerce is precluded from subsequently resolving a scope issue without resorting to the factors of § 351.225(k)(2).

Plaintiff argues, next, that the Final Scope Ruling is inconsistent with a prior scope ruling by Commerce. Pl.'s Br. 7 (citing, *inter alia*, *Final Scope Ruling on Side Mount Valve Controls*, A-570-967, C-570-968 (Oct. 26, 2012), Attach. in App. to Mem. in Supp. of Meridian's Mot. J. Agency R. (May 19, 2014), ECF No. 39). The cited ruling, which pertains to an unassembled good imported as a kit, *id*. at 2, does not address the issue posed by the Type A and Type C handles.

Finally, Meridian maintains that the Final Scope Ruling is contrary to law because, according to Meridian, Commerce imposed, as a condition for satisfying the finished merchandise exclusion or the finished goods kit exclusion, an "aluminum content" requirement

under which the good under consideration cannot qualify if it consists entirely of aluminum extrusions. Pl.'s Br 10-19. This argument, which Meridian directs to all three handle types, does not address the specific issues posed by the Type A and Type C handles, which cannot satisfy the requirements of either exclusion.

E.  The Court Remands for Reconsideration the Department's Determination that the Type B Handles Are Within the Scope of the Orders

In a leading case, the Court of Appeals for the Federal Circuit has held that "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) ("*Duferco*"). This case presents the issue of whether Commerce based its conclusion that the Type B handles are subject merchandise on a reasonable interpretation of the scope language. The court concludes that it did not and, therefore, remands this issue for redetermination.

1. Commerce Did Not Base its Determination that the Type B Handles Are Within the Scope on a Reasonable Interpretation of the General Scope Language

The threshold question presented is whether Commerce, in placing the Type B handles within the scope of the Orders, based that determination on a reasonable interpretation of the general scope language, i.e., the scope language considered apart from the exclusions. The Type B handles, in contrast to the Type A and Type C handles, are not one-piece articles but instead are assemblies comprised of an extruded aluminum "middle handle bar extrusion piece" and "two plastic injection molded end caps." *Scope Ruling Request* 2. According to record documents, including a document containing detailed illustrations of the Type B handles, the assembly also includes two screws that attach the end caps to the "extrusion piece." *Id*. at Attachment 1, "Type B Handles," "Sec. A-A." Thus, the record shows that a Type B handle is

an assembled article consisting of five parts: the extrusion piece, the two end caps, and the two screws attaching the end caps to the extruded aluminum component.

The general scope language provides that the subject merchandise is "aluminum extrusions." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,653. An "extrusion," according to the general scope language, is a shape or form produced by an extrusion process. *Id*. As so defined, the term "extrusion" does not describe the Type B handles. Moreover, no scope language in the Orders is so open-ended as to sweep into the scope all assembled goods that contain one or more aluminum extrusions as parts.

Certain language in the scope description of the Orders refers to "parts," but this language is limited in such a way that it does not describe the Type B handles. The Orders provide that "[s]ubject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture." *AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,654. According to plain meaning, this sentence clarifies that an aluminum extrusion generally is within the scope even though it may have been fabricated so as to make it suitable for use as a part of a "final finished product." The sentence is addressing an "extrusion," i.e., a shape or form produced by an extrusion process, not a good which, when imported, is an assembled good *containing* an extrusion. As the scope language states in the following sentence, "[s]uch parts *that otherwise meet the definition of aluminum extrusions* are included in the scope." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654 (emphasis added).

In the next sentence, the scope language provides that "[t]he scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of the finished goods 'kit' defined

further below." *Id*. This is the only scope language that arguably could be read to expand the scope beyond products that fit within the plain meaning of the definition of "extrusion" provided by the first sentence of the scope language. In the Final Scope Ruling, Commerce did not conclude that the Type B handles are "partially assembled merchandise" and did not conclude that these handles fall within the "subassemblies" provision of the general scope language. This is understandable, as there is record evidence in this case that the Type B handles, which are the "merchandise" under consideration, are imported in fully assembled, not "partially assembled," form. Further, as to all three handle types, Commerce found that "the products at issue are ready for use 'as is' at the time of importation." *Final Scope Ruling* 13. This finding appears inconsistent with a finding or inference that the Type B handles are "partially assembled merchandise."

Making no mention of the "subassemblies" provision, Commerce found that the Type B handles are themselves "extrusions" within the meaning of the general scope language, including, in particular, the definition of the term set forth in the first sentence of the scope language. *Id.* at 12 ("We find that Meridian's products are 'aluminum extrusions which are shapes and forms,' made of an aluminum alloy that is covered by the scope of the *Orders*"; "the products at issue meet the description of subject extrusions"; "Meridian's products are merely aluminum extrusions that meet the physical description of subject merchandise, referred to by their end use: as door handles for kitchen appliances, such as refrigerators and ovens."). The conclusion that the Type B handles fall within the general scope language is unsupported by the wording of the general scope language as applied to the uncontradicted record evidence, which is that a Type B handle is not an extrusion but rather is an assembly containing an extrusion, produced by assembling an aluminum extrusion, two plastic end caps, and two screws. According to the general scope language, an "extrusion" is a shape or a form produced by an

extrusion process, not by an assembly process performed upon an extrusion and other components.

In concluding that the Type B handles are described by the general scope language, Commerce appears to have disregarded the presence of the parts of the Type B handle—other than the part that is an aluminum extrusion—on the premise that these other parts are "fasteners." To this end, Commerce stated in the Final Scope Ruling that "[a]side from the inclusion of fasteners for Type B handles, the products at issue consist of aluminum extrusions extrusion [*sic*] made of 6000 series aluminum alloy." *Id*.  Commerce proceeded to a conclusion that "Meridian's products consist entirely of aluminum extrusions, with the exception of fasteners, which, *by the language of the scope*, do not remove the aluminum extrusion product from the scope." *Id*. at 13 (emphasis added).  Because the "language of the scope" does not support the interpretation Commerce places upon it, the Department's logic is flawed.

The only reference to "fasteners" in the general scope language occurs in the aforementioned provision addressing "subassemblies." *See AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654 ("The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or *fasteners*) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below." (emphasis added)).  As noted above, Commerce based its reasoning on a conclusion that each of the three handle types, including the Type B handle, constitutes an "extrusion" as defined in the general scope language, not on the subassemblies provision.  The second use of the term "fasteners" in the scope language occurs in the description of the finished goods kit exclusion, which states that "[a]n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the investigation merely by including fasteners such as

screws, bolts, *etc*. in the packaging with an aluminum extrusion product." *Id*. This language limits the finished goods kit exclusion. It does not expand the general scope of the Orders.

A second flaw in the Department's logic is the interpreting of the term "fasteners" so broadly as to encompass the plastic end caps. Illustrations of the Type B handles in the record demonstrate that the plastic end caps are specialized parts, molded to a shape necessary to their function as components of a complete handle assembly, in which they are fitted to the ends of the extruded aluminum component. *See Scope Ruling Request*, Attachment 1, "Type B Handles," "Sec. A-A." The scope language contains no definition of the term "fastener," and nothing in the scope language suggests that the term should be given a meaning broad enough to include the plastic parts. To the contrary, the absence of a definition connotes that the term was intended to be accorded its common and ordinary meaning; i.e., absent a contrary indication of intent the term should be construed to have a meaning consistent with its use in common and commercial parlance. The reference to "fasteners" in the finished good kit exclusion, by referring to "fasteners such as screws, bolts, *etc.*," *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654, further connotes an intention that the term be given its common and commercial meaning rather than the unusually broad meaning required by the Department's implicit reasoning.

In summary, the Department failed to base its conclusion that the Type B handles are described by the general scope language on a reasonable interpretation of that language. This flaw, considered by itself, requires a remand. But even were the court to assume, *arguendo*, that the general scope language reasonably could be interpreted to include the Type B handles, it still would conclude that the Department's reasoning is flawed in the interpretation of one of the specific exclusions set forth in the scope language.

### 2.  Commerce Employed Flawed Logic in Concluding that the Finished Merchandise Exclusion Did Not Apply to the Type B Handles

As discussed previously in this Opinion and Order, the scope contains an exclusion that is limited to goods imported in assembled form.  Excluded from the scope is "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels."  *Id*.

The first issue posed by the language of the exclusion is whether the Type B handles are "finished merchandise."  According to the Scope Ruling Request, these handles are imported in a form ready for their intended use, i.e., they are complete handles ready for attachment to oven doors.  *See*, *e.g.*, *Scope Ruling Request* 3 ("In addition, the kitchen appliance door handles are in a form ready to be sold directly to, and used by, the consumer/end user.").  They appear to fall within the meaning of the term "finished merchandise" as used in the scope language.  The Final Scope Ruling does not find to the contrary and includes the aforementioned finding that "the products at issue are ready for use 'as is' at the time of importation."  *Final Scope Ruling* 13.  In the context of the term "merchandise" when read in the plural, these handles also appear to be described by the term "merchandise containing aluminum extrusions as parts."[3]  Finally, there is record evidence that the Type B handles are "permanently assembled and completed at the time of entry."  *Scope Ruling Request* 2 ("The handle is an *assembly* of the middle handle bar extrusion piece plus two plastic injection molded end caps at each end." (emphasis added)), Attachment 1, "Type B Handles," "Sec. A-A."

---

[3] Only a strained, and paradoxical, reading of the language of the finished merchandise exclusion would lead to a conclusion that an assembled article, among its multiple assembled parts, must contain more than one extruded aluminum part to qualify for exclusion from the scope thereunder, and in the Final Scope Ruling Commerce did not so interpret the language.

The Final Scope Ruling does not analyze the Type B handles separately with respect to the finished merchandise exclusion. Instead, its analysis addresses all three handle types simultaneously, concluding that the handles do not qualify for either the "finished merchandise" or the "finished goods kit" exclusion. Discussing the finished merchandise exclusion, Commerce found that "the record is undisputed that the aluminum extrusion parts are not fully and permanently assembled with non-aluminum extrusion parts at the time of entry."[4] *Final Scope Ruling* 13. Commerce also found, however, that the Type B handles "are made of aluminum extrusions, plus two plastic injection molded end caps at each end" that "are used to fasten the handle to the door." *Id.* at 2. Although it did not so state, Commerce apparently concluded, first, that the presence of "fasteners" is to be disregarded when the question is whether a good qualifies as "merchandise containing aluminum extrusions as parts" for purposes of the finished merchandise exclusion and, second, again concluded that the plastic end caps present in the Type B handles are "fasteners."

The conclusion that the plastic end caps are "fasteners" suffers from the flaw the court discussed above with respect to the general scope language. But there is also an interpretive difficulty with the Department's apparent reasoning that the presence of fasteners is to be disregarded for purposes of applying the finished merchandise exclusion. The difficulty is that the finished merchandise exclusion contains no reference to fasteners. This contrasts with the finished goods kit exclusion, under which express language instructs that the presence of

---

[4] Commerce implicitly interpreted the finished merchandise exclusion to require that an assembled good, in order to qualify, must contain at least one part that is not an aluminum extrusion. The plain language of the finished merchandise exclusion does not so require, and any support for such an interpretation could be found only by reading the examples as limiting the express language. At this time, the court need not decide whether this is a reasonable interpretation of the language in question.

fasteners in the packaging is to be disregarded.  *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

In summary, the Final Scope Ruling fails to demonstrate the reasonableness of the Department's conclusion that the Type B handles do not satisfy the requirments of the finished merchandise exclusion when the scope language setting forth that exclusion is interpreted according to plain meaning.

3.  Commerce Must Reconsider Its Determination that the Type B Handles Are Within the Scope

In summary, the Department's determination in the Final Scope Ruling that the Type B handles are within the scope of the Orders is not based on reasonable interpretations of the general scope language and the finished merchandise exclusion.  Commerce, therefore, must reconsider its determination that the Type B handles are within the scope and in so doing must be mindful that its responsibility is to interpret, and not to enlarge, the scope language it previously placed in final form upon promulgation of the Orders.  *See Duferco*, 296 F.3d at 1097-98.

4.  Defendant's and Defendant-Intervenor's Arguments Fail to Confront the Problems in the Department's Determination that the Type B Handles Are Within the Scope

Defendant and defendant-intervenor, in opposing plaintiff's motion for judgment on the agency record, raise several arguments in advocating affirmance of the Final Scope Ruling in the entirety.  The arguments are unconvincing when considered in the context of the issues presented by the Type B handles.

Defendant argues that the Department's determination is supported by the plain language of the orders, Def.'s Br. 7, but defendant's arguments do not overcome the errors in the Department's analysis.  Defendant argues, for example, that "[t]he record is undisputed that Meridian's kitchen appliance door handles consist entirely of aluminum extrusions and fasteners," *id.*, but as to the Type B handles, this characterization of the record is incorrect: the

record contains documentary evidence that a Type B handle is an assembly and that the plastic end caps do not resemble a product described by the term "fastener" as that term is commonly and commercially used. Further, defendant does not explain why it was reasonable for Commerce to conclude that an assembly such as a Type B handle falls within the general scope language or that the presence of fasteners within an assembly is ignored for purposes of the general scope language or the finished merchandise exclusion.

Defendant next argues that "Commerce determined that Meridian's door handles consist entirely of aluminum extrusions matching the physical description of subject merchandise" and that "Meridian does not challenge this conclusion." *Id*. at 8. In making this argument, defendant cites the finding in the Final Scope Ruling that "Meridian's products are 'aluminum extrusions which are shapes and forms,' made of an aluminum alloy that is covered by the scope of the orders." *Id*. (citing *Final Scope Ruling* 12). In a footnote to its statement that "Meridian does not challenge this conclusion," defendant adds an argument that "Meridian also does not challenge Commerce's determination that the 'finished merchandise' exclusion did not apply because 'the record is undisputed that the aluminum extrusion parts are not fully and permanently assembled with non-aluminum extrusion parts at the time of entry' as required by the exclusionary language in the orders." *Id*. at 8 n.4. (citing *Final Scope Ruling* 13). Defendant appears to advocate that the court should refuse on grounds of waiver to consider whether the handles, and the Type B handles in particular, are described by the general scope language or qualify under the finished merchandise exclusion. If that actually is defendant's argument, the court rejects it. In support of its Rule 56.2 motion, plaintiff argues, *inter alia*, that the Department's determination "impermissibly expanded the scope of the orders by interpreting the scope language in a manner inconsistent with its terms . . . ." Pl.'s Br. 1. As to the finished merchandise exclusion, plaintiff maintains that its handles fall within what it terms the "finished

goods exclusion," which the court interprets as a reference to the "finished merchandise" exclusion. *Id*. at 7, 9-10. That plaintiff also argues, unconvincingly, that its handles meet the requirements of the finished goods kit exclusion does not defeat its claim. The court declines defendant's invitation to decide this case without reaching the merits.

Defendant-intervenor argues as to all three handle types that "Commerce's ultimate conclusion that the kitchen appliance handles are within the scope was correct." Def.-Int.'s Br. 5. Defendant-intervenor's arguments, like defendant's arguments, fail to confront the problems the plain meaning of the scope language poses for the Department's interpretation as applied to the Type B handles.

Directing the court's attention to the provision in the scope language addressing "subassemblies," defendant-intervenor argues that "[b]ecause the kitchen appliance handles are subassemblies, or parts, of a final finished product, (*i.e.*, a kitchen appliance), which are explicitly covered by the scope language, the handles cannot fall within the scope exclusion for 'finished good kits' from which a 'final finished good' is assembled." *Id.* at 2. Defendant-intervenor elaborates that "[t]he combination of the subassembly language, which indicates that the aluminum extrusions within a subassembly remain subject even when the subassembly includes non-extruded parts, and the use of the word 'final' in the finished goods exclusion clearly shows that subassemblies of larger products are not themselves 'final finished products.'" *Id*. at 6-7. Defendant-intervenor adds that "subassemblies, or parts, of larger, final finished products are within the scope of the orders, as they cannot fall under the exclusion for 'final finished goods [*sic*].'"[5] *Id*. at 7. Defendant-intervenor's argument attempts to supply a rationale

---

[5] Defendant-intervenor's argument appears to conflate the finished goods kit exclusion, which uses the word "final," and the finished merchandise exclusion, which does not.

for the Final Scope Ruling different from that upon which Commerce based the Final Scope Ruling. Commerce did not rely upon the subassemblies language in concluding that the handles are subject merchandise. *See Final Scope Ruling* 12-15. The court must review the Department's determination on the reasoning Commerce put forth. Moreover, as the court has discussed, the "subassemblies" language in the scope applies to "partially assembled merchandise," *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654; defendant-intervenor fails to reconcile its argument with record evidence that the Type B handle is imported in fully assembled form and with the Department's finding that the handles "are ready for use 'as is' at the time of importation," *Final Scope Ruling* 13.

The remaining arguments of defendant and defendant-intervenor address issues that are not relevant to a resolution of the issues raised by the Type B handles.

### III. CONCLUSION AND ORDER

The court denies relief on plaintiff's claim as to the Type A and Type C appliance door handles at issue in this case and remands for reconsideration the Department's determination that the Type B handles are within the scope of the Orders.

Therefore, upon consideration of the Final Scope Ruling and all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Final Scope Ruling is affirmed in its determination that the Type A and Type C appliance door handles are within the scope of the Orders; it is further

**ORDERED** that the Final Scope Ruling be, and hereby is, remanded for reconsideration, in accordance with this Opinion and Order, of the Department's determination that the Type B appliance door handles are within the scope of the Orders; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order to file a remand redetermination comprising a new scope ruling addressing the Type B handles that complies with this Opinion and Order; it is further

**ORDERED** that plaintiff, plaintiff-intervenor, and defendant-intervenor shall have thirty (30) days from the date of the Department's filing of the remand redetermination in which to file comments on the remand redetermination; and it is further

**ORDERED** that defendant shall have fifteen (15) days after the filing of the last comment by plaintiff, plaintiff-intervenor, or defendant-intervenor in which to file a reply to the comments of the other parties.

                                                                    /s/ Timothy C. Stanceu
                                                                    Timothy C. Stanceu
                                                                    Chief Judge

Dated:  December 7, 2015
             New York, New York