Slip Op. 16-71

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MERIDIAN PRODUCTS, LLC,**<br><br>    Plaintiff,<br><br>and<br><br>**WHIRLPOOL CORPORATION,**<br><br>    Plaintiff-Intervenor,<br><br>v.<br><br>**UNITED STATES**,<br><br>    Defendant,<br><br>and<br><br>**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**<br><br>    Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge<br><br>Court No. 13-00246 |

## OPINION

[Affirming an agency's conclusion, presented in a determination issued in response to a previous court order, that an imported good is not within the scope of antidumping and countervailing duty orders on imported aluminum extrusions]

Dated: July 18, 2016

*Daniel J. Cannistra*, Crowell & Moring, LLP, of Washington, D.C., for plaintiff. With him on the brief was *Alexander Schaefer*.

*Donald Harrison*, Gibson, Dunn & Crutcher, LLP, of Washington, D.C., for plaintiff-intervenor.

*Tara K. Hogan*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Jessica M. Link*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor.

Stanceu, Chief Judge: In this action, plaintiff Meridian Products, LLC ("Meridian") contested a 2013 "Final Scope Ruling" in which the International Trade Administration, United States Department of Commerce ("Commerce" or "the Department") construed the scope of antidumping and countervailing duty orders (the "Orders") on aluminum extrusions from the People's Republic of China ("China" or the "PRC") to include three types of kitchen appliance door handles.

Before the court is the decision (the "Remand Redetermination") Commerce issued following the court's order remanding the Final Scope Ruling for reconsideration. *Final Results of Redetermination Pursuant to Court Remand* Meridian Products, LLC v. United States (Mar. 23, 2016), ECF No. 67 ("*Remand Redetermination*").  In its earlier opinion and order, the court affirmed the Department's decision that two types of handles are within the scope of the Orders but ordered reconsideration of the Department's decision as to the third. *Meridian Products, LLC v. United States*, 39 CIT __, 125 F. Supp. 3d 1306 (2015) ("*Meridian I*").  In response to the court's order, Commerce determined, under protest, that this third handle type was outside the scope of the Orders.  The Aluminum Extrusions Fair Trade Committee ("AEFTC"), a trade association of U.S. producers of aluminum extrusions and a petitioner in the antidumping and countervailing duty investigations, opposes the Remand Redetermination.  The court affirms the Department's conclusion that the third handle type does not fall within the scope of the Orders.

**I. BACKGROUND**

The court's earlier opinion contains background material on this case, which is supplemented herein.  *See Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1308-09.

Commerce issued the antidumping and countervailing duty orders on aluminum extrusions from China in May 2011. *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Int'l Trade Admin. May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Int'l Trade Admin. May 26, 2011) ("*CVD Order*"). Meridian filed with Commerce a request for a scope ruling ("Scope Ruling Request") on January 11, 2013, in which it sought a ruling excluding from the scope of the Orders the three types of appliance door handles at issue in this case. *Letter Requesting a Scope Ruling Regarding Kitchen Appliance Door Handles* (Jan. 11, 2013) (A.D.R.Doc. No. 1, C.V.D.R.Doc. No. 1) ("*Scope Ruling Request*").[1] After conducting an administrative proceeding, Commerce issued the Final Scope Ruling on June 21, 2013. *Final Scope Ruling on Meridian Kitchen Appliance Door Handles*, C-570-968, A-570-967 (June 21, 2013) (A.D.R.Doc. No. 34, C.V.D.R.Doc. No 36), *available at* http://enforcement.trade.gov/download/prc-ae/scope/32-Meridian-kitchen-door-handles-21jun13.pdf (last visited July 7, 2016) ("*Final Scope Ruling*").

Meridian commenced this action on July 10, 2013, Summons, ECF No. 1; Compl., ECF No. 4, and, on May 12, 2014, Meridian filed its motion for judgment on the agency record, claiming that Commerce erred in determining that each of the three appliance door handle types was within the scope of the Orders. Pl.'s Mot. J. Agency R., ECF No. 38. The court's earlier opinion and order granted plaintiff's motion in part, and denied it in part, affirming the

---

[1] Citations to the index for the administrative record for the antidumping duty order, case number A-570-967, are referenced herein as "A.D.R.Doc. No." Citations to the index for the administrative record for the countervailing duty order, case number C-570-968, are referenced herein as "C.V.D.R.Doc. No." Citations to the indices for the administrative record on remand for either of these orders, for which the remand records are identical, are referenced herein as "Remand R.Doc. No."

Department's decision as to two types of Meridian's handles (the "Type A" and "Type C" handles), each of which is a one-piece article fabricated from a single aluminum extrusion, and remanding the decision as to the remaining, "Type B," handles, each of which is an assembly consisting of a component fabricated from an aluminum extrusion and other, non-aluminum components. *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1310-17. On February 25, 2016, Commerce provided the parties, and invited comment on, a determination in draft form, *Draft Results of Redetermination Pursuant to Court Remand*, (Feb. 25, 2016) (Remand.R.Doc. No. 1). On March 23, 2016, Commerce filed the Remand Redetermination now before the court. On April 22, 2016, AEFTC filed its comments opposing the Remand Redetermination. *Def.-Int. the Aluminum Extrusions Fair Trade Committee's Comments on Final Results of Redetermination Pursuant to Court Remand*, ECF No. 69 ("*AEFTC's Remand Comments*"). On June 3, 2016, defendant replied to these comments. *Def.'s Resp. to Def.-Int.'s Remand Comments*, ECF No. 74.[2]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over civil actions brought under section 516A of the Tariff Act of 1930 ("Tariff Act"). 19 U.S.C. § 1516a(a)(2)(B)(vi).[3] Section 516A provides for judicial review of a determination of "whether a particular type of merchandise is within the class or kind of merchandise described in an . . . antidumping or

---

[2] Plaintiff-intervenor Whirlpool Corporation has not submitted briefing in this proceeding.

[3] All statutory citations herein are to the 2012 edition of the United States Code.

countervailing duty order." *Id*. In reviewing the redetermination on remand, the court must set aside "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1)(B)(i).

### B.  Description of the Merchandise in Meridian's Scope Ruling Request

The only remaining appliance door handle type at issue in this litigation is Meridian's "Type B handle." *See Remand Redetermination* 1. The Type B handle, which was made for installation on oven doors, is an assembly consisting of five parts: a "middle handle bar extrusion piece" fabricated from an aluminum extrusion, two plastic injection-molded end caps (located at each end), and two screws that attach the end caps to the handle bar. *See Scope Ruling Request* 2 & Attach. 1, "Type B Handles," "Sec. A-A." Describing all three handle types, the Scope Ruling Request stated that "[a]ll of the components are fully fabricated and do not require further cutting, punching, or other processing prior to their assembly and installation to the finished oven," that the Type B handles "are in a form ready to be sold directly to, and used by, the consumer/end-user," and that "[t]he package contains the components such as bottom mount fasteners and allen wrench necessary for installation by the customer," *id*. at 3, and is "shipped to the customer with assembly instructions," *id*. at 4.

### C.  The Scope Language in the Orders

The scope language of the antidumping duty order and the scope language of the countervailing duty order are essentially identical. The Orders apply to "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,653. The scope includes aluminum extrusions that are "imported with a variety of

finishes" or that are "fabricated (i.e., prepared for assembly)" by "operations" that "would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654. The scope also includes such aluminum extrusions even if they are "described at the time of importation as parts for final finished products that are assembled after importation . . ." provided they "otherwise meet the definition of aluminum extrusions." *AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,654. The scope includes goods "identified with reference to their end use" provided "they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

The scope language contains an exclusion applying to certain "finished merchandise," which reads as follows:

> The scope . . . excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels.

*Id*.

D. The Remand Redetermination Reached the Correct Conclusion that the Type B Handles Are Not Within the Scope of the Orders

1. The Court's Decision in *Meridian I*

In *Meridian I*, the court first analyzed what it termed the "general scope language" of the Orders, i.e., the language in the Orders that defines generally the merchandise falling within the scope, considered apart from any specific exclusions. *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1312-13. Noting that "[t]he general scope language provides that the subject merchandise is 'aluminum extrusions'" and that "[a]n 'extrusion,' according to the general scope language, is a shape or form produced by an extrusion process," the court opined that "no scope language in the

Orders is so open-ended as to sweep into the scope all assembled goods that contain one or more aluminum extrusions as parts." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1312 (citations omitted). The court observed that the general scope language expressly includes a shape or form produced by an extrusion process that has been fabricated after extrusion to make it suitable for use as a part of a final finished product, provided the fabricated part otherwise meets the definition of an aluminum extrusion. *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1312-13. *Meridian I* drew a distinction between an article fabricated after extrusion and one resulting from an assembly process, opining that "[t]he conclusion that the Type B handles fall within the general scope language is unsupported by the wording of the general scope language as applied to the uncontradicted record evidence, which is that a Type B handle is not an extrusion but rather is an assembly containing an extrusion, produced by assembling an aluminum extrusion, two plastic end caps, and two screws." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1313.

The court also noted that in placing the Type B handles within the scope, Commerce did not apply the "subassemblies" provision in the scope language. *Id.* The "subassemblies" provision states that, except for a good satisfying a specific exclusion (the "finished goods kit" exclusion),[4] "[t]he scope includes the aluminum extrusion components that are attached (*e.g.*, by

---

[4] The "finished goods kit" exclusion referenced in the subassemblies provision reads as follows:

> The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the
> (continued…)

welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise . . . ."[5] *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654. That Commerce did not apply the subassemblies provision was, according to the court, "understandable, as there is record evidence in this case that the Type B handles, which are the 'merchandise' under consideration, are imported in fully assembled, not 'partially assembled,' form." *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1313. The court added that "as to all three handle types, Commerce found that 'the products at issue are ready for use "as is" at the time of importation.'" *Id.* (quoting *Final Scope Ruling* 13).

Rather than deem a Type B handle a "subassembly," Commerce concluded that the good fell within the scope definition of "extrusion." The court took issue with the Department's conclusion in the Final Scope Ruling that the Type B handles "consist entirely of aluminum extrusions, with the exception of fasteners, which, by the language of the scope, do not remove the aluminum extrusion product from the scope." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1313-14 (quoting *Final Scope Ruling* 13). The court viewed this conclusion as flawed in two respects. The court viewed as unreasonable an interpretation of the scope language under which any

---

(continued…)

investigation merely by including fasteners such as screws, bolts, *etc.* in the packaging with an aluminum extrusion product.

*AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

[5] Under this "subassemblies" provision, the scope includes only the components within an assembly that are aluminum extrusions and thus "does not include the non-aluminum extrusion components of subassemblies . . . ." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

assembly containing an aluminum extrusion is considered an "extrusion" within the meaning of the scope language merely on the premise that non-aluminum-extrusion components within the assembly are characterized as "fasteners." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1313-14. The court added that "[a] second flaw in the Department's logic is the interpreting of the term 'fasteners' so broadly as to encompass the plastic end caps," noting that "[i]llustrations of the Type B handles in the record demonstrate that the plastic end caps are specialized parts, molded to a shape necessary to their function as components of a complete handle assembly, in which they are fitted to the ends of the extruded aluminum component." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1314 (citing *Scope Ruling Request,* Attachment 1, "Type B Handles," Sec. A-A."). The court considered Commerce to have applied an "unusually broad meaning" to the term "fasteners" that differed from the common and ordinary meaning of the term. *Id.* The court summarized its holding by stating that "the Department failed to base its conclusion that the Type B handles are described by the general scope language on a reasonable interpretation of that language." *Id.*

While deciding that the Department's misinterpretation of the general scope language was sufficient by itself to require it to remand the Final Scope Ruling, the court also found fault with the Department's conclusion that the Type B handles did not qualify for the "finished merchandise exclusion." *Id.* The court noted that the Final Scope Ruling, in considering the finished merchandise exclusion, did not analyze the Type B handles separately but instead concluded generally that this exclusion did not apply to any of the three handle types. The court noted that the Final Scope Ruling found as to all three handle types that "the record is undisputed that the aluminum extrusion parts are not fully and permanently assembled with non-aluminum extrusion parts at the time of entry," *id.*, 39 CIT at __, 125 F. Supp. 3d at 1315 (quoting *Final Scope Ruling* 13), but nevertheless also found "that the Type B handles 'are made of aluminum

extrusions, plus two plastic injection molded end caps at each end' that 'are used to fasten the handle to the door,'" *id.* (quoting *Final Scope Ruling* 2). The court opined that "[a]lthough it did not so state, Commerce apparently concluded, first, that the presence of 'fasteners' is to be disregarded when the question is whether a good qualifies as 'merchandise containing aluminum extrusions as parts' for purposes of the finished merchandise exclusion and, second, again concluded that the plastic end caps present in the Type B handles are 'fasteners.'" *Id.* The court identified two shortcomings in this analysis. First, the court again noted the flaw in deeming the plastic end caps "fasteners." *Id.* Second, the court identified an "interpretive difficulty with the Department's apparent reasoning that the presence of fasteners is to be disregarded for purposes of applying the finished merchandise exclusion." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1315-16. In the court's view, "[t]he difficulty is that the finished merchandise exclusion contains no reference to fasteners" and that "[t]his contrasts with the finished goods kit exclusion, under which express language instructs that the presence of fasteners in the packaging is to be disregarded." *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1316. The court considered the Final Scope Ruling to have failed "to demonstrate the reasonableness of the Department's conclusion that the Type B handles do not satisfy the requirements of the finished merchandise exclusion when the scope language setting forth that exclusion is interpreted according to plain meaning." *Id.*

### 2. The Remand Redetermination

Commenting that "the Court disagreed with the Department's interpretation that Meridian's Type B door handles are covered by the plain language of the scope . . . ," Commerce stated in the Remand Redetermination that "[w]e find, therefore, under respectful protest, that Meridian's Type B door handles are outside the scope of the *Orders* because, consistent with the Court's interpretation of the scope language, there is no general scope language which covers such products." *Remand Redetermination* 8 (footnote omitted). Commerce added that it did

"not need to address the issue of whether Meridian's Type B door handles are excluded under the finished merchandise exclusion" because, consistent with the Court's interpretation of the scope language, "there is no general scope language which covers Meridian's Type B door handles." *Id.*

The court affirms the Department's decision that the Type B handles are not within the scope of the Orders. However, the court does not affirm the Remand Redetermination in the entirety. In the portion of the Remand Redetermination that responds to AEFTC's comments on the draft version of the Remand Redetermination, Commerce misinterpreted the court's opinion in *Meridian I* in one respect and also appears to have misinterpreted it in a second respect, as discussed below.

The Remand Redetermination summarizes several arguments AEFTC made in commenting on the draft that pertain to the presence of the plastic end caps in the Type B handle assemblies. *See Remand Redetermination* 9-10. In response to these arguments, the Remand Redetermination states that "[w]e agree with Petitioner that both the scope language and the record evidence support a finding that the plastic end caps in question should be treated as fasteners, and, therefore, Meridian's Type B door handles consist solely of aluminum extrusions and fasteners." *Id.* at 10. The Remand Redetermination then explains that "[h]owever, the Court has made a specific finding that, based on the scope language and this same record evidence, the plastic end caps are not fasteners." *Id.* at 10-11 (footnote omitted). This statement mischaracterizes the court's holding, which did not make a "finding" as posited by the Remand Redetermination. Although critical of the Department's deeming the end caps to be "fasteners" due to the unusually broad definition Commerce lent to the term, the court based its analysis on the scope language and the uncontested fact that each Type B handle is an assembly containing a component fabricated from an aluminum extrusion, two plastic end caps, and two screws. It

recognized that the general scope language defines "extrusions" as "shapes and forms, produced from an extrusion process . . ." rather than define the term so broadly as to sweep into the scope all assembled articles consisting of a component fabricated from an aluminum extrusion and other, non-aluminum-extrusion components. *See Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1312-14. The Department's statements in the Remand Redetermination that the scope language and record support a finding that the end caps "should be treated as fasteners," and that the presence of the end caps and the screws fastening them to the middle handle bar should be disregarded, do not change the uncontested fact that the Type B handles are assemblies. The scope language does not provide that an assembly containing an extrusion covered by the Orders somehow *becomes* a covered extrusion should Commerce decide that all non-aluminum-extrusion components in the assembly should be "treated as" fasteners.

In addition, Commerce appears to have misinterpreted the court's ruling in *Meridian I* with respect to the "subassemblies" provision in the scope language. The Remand Redetermination responds to an argument by AEFTC "that general scope language, in particular the 'parts' and 'subassemblies' language, covers aluminum extrusions which contain non-extruded components such as Meridian's Type B Door Handles." *Remand Redetermination* 11. The Department's response is as follows:

> We agree with Petitioner that the Department's underlying scope ruling correctly determined that the Type B Door Handles are covered by the general scope language and are not excluded under either the finished merchandise or finished goods kit exclusions. However, as discussed above, the Court found that the general scope language upon which the Department relied in finding that Meridian's Type B Door Handles are subject to the *Orders* does not support Commerce's interpretation. Moreover, although the Court identified additional general scope provisions, *i.e.*, the 'parts' language and 'subassemblies' language, which also could be considered relevant, the Court ultimately found that, based on the record evidence, these provisions would not support a finding that Meridian's Type B Door Handles are covered by the *Orders*.

*Remand Redetermination* 13 (footnotes omitted).

The Remand Redetermination is incorrect in implying that the court reached a holding that the subassemblies provision "would not support a finding that Meridian's Type B Door Handles are covered by the *Orders*." Although the court disagreed that the "parts" language of the Orders supported the Department's conclusion that the Type B handles are within the scope (because this language is expressly limited to parts "*that otherwise meet the definition of aluminum extrusions*," Meridian I, 39 CIT at __, 125 F. Supp. 3d at 1313 (citing *AD Order*, 76 Fed. Reg. at 30,651, *CVD Order*, 76 Fed. Reg. at 30,654 (emphasis added))), the court did not reach any holding as to the "subassemblies" language and was not in a position to do so. The Final Scope Ruling is a determination that the entire Type B handle is an "extrusion" within the scope of the Orders and did not qualify for any exclusion; that was the only determination before the court in *Meridian I*. The Final Scope Ruling is not a determination that the extruded aluminum component (the "middle handle bar"), standing alone, is within the scope of the Orders by operation of the subassemblies provision, which played no role in the Department's analysis in the Final Scope Ruling. Accordingly, the court's comments as to why it was understandable that Commerce, on the record before it, did not apply the subassemblies provision are *dicta*. Therefore, had Commerce decided to base the *Remand Redetermination* on the subassemblies provision and thereby place the aluminum extrusion component of each Type B handle, and only the aluminum component, within the scope by operation of that provision, the holding in *Meridian I* would not have precluded Commerce from doing so. Instead, Commerce chose to protest the court's holding in *Meridian I* on the ground that its original determination as to the Type B handles was correct because, according to Commerce, each Type B handle as an entirety should have been held by the court to be an "extrusion" within the scope language and not to qualify for any exclusion. *See*, e.g*., Remand Redetermination* 13 (agreeing with AEFTC that "the Department's underlying scope ruling correctly determined that

the Type B Door Handles are covered by the general scope language and are not excluded under either the finished merchandise or finished goods kit exclusions"), 15 (" . . . we respectfully disagree with the Court that Meridian's Type B Door Handles are not covered by the plain language of the scope . . . ."). A determination by Commerce that the subassemblies provision should apply in this case would have been a different determination with a different result, under which only a component of a Type B handle, not the entire handle, could be considered to fall within the scope of the Orders.

### 3.  AEFTC's Comments on the Remand Redetermination

In opposing the Remand Redetermination, AEFTC advances three arguments as to why the court should return the Remand Redetermination to Commerce for reconsideration. All three arguments are thinly disguised attempts to request reconsideration of the court's holding in *Meridian I*. The court declines to reconsider its holding. Even were it to do so, it would conclude that all three arguments AEFTC advances are meritless.

AEFTC argues, first, that Commerce reached a "critical and unsupported conclusion" that the end caps attached to Meridian's Type B handles are not properly classified as fasteners. *AEFTC's Remand Comments* 4. Second, AEFTC raises a related argument that Commerce reached a "critical and unsupported conclusion" that "the general language of the scope does not cover or apply to Meridian's Type B handles." *Id.* Third, AEFTC argues that Commerce erred in declining to analyze the issue of whether the Type B handles qualify under the "finished merchandise" exclusion. *Id.* at 7.

In its argument directed to the plastic end caps, AEFTC essentially is asking the court to reconsider the conclusions the court reached in *Meridian I* pertaining to the interpretive flaws in the Final Scope Ruling that relate to the presence of these plastic components. Submitting that fasteners "serve an attachment function" and that the plastic end caps "serve just such a function,

much like a type of nut," *id.* at 5, AEFTC incorrectly states that "Meridian's Type B handles are comprised only of an extruded aluminum handle and fasteners (*i.e.*, plastic end-caps and screws), and so would not qualify for exclusion from the scope," *id.* at 6 (citations omitted). This argument misrepresents the evidentiary record. The uncontested record facts are that two plastic end caps are components of each Type B oven door handle and are specially designed for that purpose. The record evidence refutes any contention that the component fabricated from an aluminum extrusion was designed to serve as the oven door handle by itself. *See Scope Ruling Request* 2 & Attach. 1, "Type B Handles," "Sec. A-A." Regardless of whether the end caps can be said to "serve an attachment function," it was incorrect and misleading for AEFTC to characterize the Type B handle as comprised only of an aluminum extruded *handle* and fasteners. Contrary to AEFTC's characterizations of the record, each Type B handle is an assembly of five components: the middle handle bar (fabricated from an aluminum extrusion), two plastic end caps, and two screws that attach the end caps to the bar. *See id.* The Scope Ruling Request illustrates that the plastic end caps form part of the shape of the handle, creating the necessary space between the middle bar and the oven door. *See id.* The Scope Ruling Request illustrates further that two additional fasteners are used to attach the assembled handle to the oven door. *See id.* at Attach. 1, "Type B Handles," "Sec. A-A."

   AEFTC's second argument, which is that Commerce erred in concluding that the general language of the scope does not include Meridian's Type B handles, is also an implied request for reconsideration of the holding in *Meridian I*. In making this argument, AEFTC relies, again, on a mischaracterization of the Type B handle as "comprised only of an extruded aluminum *handle* and fasteners (*i.e.*, plastic end-caps and screws) . . . ," *AEFTC's Remand Comments* 6 (emphasis added). AEFTC also mischaracterizes the court's opinion in *Meridian I*, asserting incorrectly that "the court specifically recognized that aluminum extrusions containing non-extruded parts

are covered under the scope, albeit under the description of subassemblies." *Id.* In *dicta*, the court correctly described the subassemblies provision in narrower terms. *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1314. Under the court's analysis of the scope language in *Meridian I*, an "extrusion" is defined in terms describing a single article, not an assembly. The court recognized that the express terms of the subassemblies provision place within the scope only "aluminum extrusion components" contained within a subassembly, not the entire subassembly, and only in the circumstance in which the imported good is "partially assembled merchandise," a circumstance Commerce did not find to exist in this case. *See id.*, 39 CIT at __, 125 F. Supp. 3d at 1313.

AEFTC's final argument is that Commerce impermissibly failed "to pursue whether the handles may have been properly excluded as 'finished merchandise.'" *AEFTC's Remand Comments* 7. According to AEFTC, an "assessment of whether Meridian's Type B handles are excludable as 'finished merchandise'" is "appropriate" because, according to AEFTC, "as Commerce reasonably concluded in its Final Scope Ruling, Meridian's Type B handles are properly considered covered by the general language of the scope, as they match the physical description of the subject merchandise and consist of nothing but extruded aluminum and fasteners." *Id.* (citing *Final Scope Ruling* 12-13). The court held to the contrary in *Meridian I* for the reasons explained in that opinion. Having determined in response (albeit under protest) that the general scope language did not describe the Type B handles, the Department permissibly declined to address the application of the finished merchandise exclusion.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court affirms the Department's decision that the Type B handles are not within the scope of the Orders but does not agree with all of the statements in the Remand Redetermination that Commerce offers as an

explanation for why it has chosen to reach that decision "under protest."  Judgment will enter accordingly.

                                                            <u>/s/ Timothy C. Stanceu</u>
                                                            Timothy C. Stanceu
                                                            Chief Judge

Dated:  July 18, 2016
        New York, New York