Slip Op. 19-5

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MERIDIAN PRODUCTS LLC,** <br><br> Plaintiff, <br><br> and <br><br> **WHIRLPOOL CORPORATION,** <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> **UNITED STATES,** <br><br> Defendant, <br><br> and <br><br> **ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,** <br><br> Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge <br><br> Court No. 13-00246 |

## OPINION AND ORDER

[Ordering further agency proceedings in compliance with a mandate of the United States Court of Appeals for the Federal Circuit]

Dated:  January 14, 2019

*Daniel J. Cannistra*, Crowell & Moring, LLP, of Washington, D.C., for plaintiff.  With him on the brief was *Alexander Schaefer*.

*Donald Harrison*, Gibson, Dunn & Crutcher, LLP, of Washington, D.C., for plaintiff-intervenor.

*Aimee Lee*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel was *Jessica M. Link*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

    *Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor.

    Stanceu, Chief Judge: This litigation arose from a challenge to an administrative determination by the International Trade Administration, United States Department of Commerce ("Commerce" or the "Department"), that certain imported appliance door handles fall within the scope of antidumping and countervailing duty orders on certain aluminum extrusions from the People's Republic of China.

    Before the court is the mandate issued by the United States Court of Appeals for the Federal Circuit ("Court of Appeals") in *Meridian Prods. v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) ("*Meridian III*").  CAFC Mandate in Appeal # 16-2657 (June 28, 2018), ECF No. 82. *Meridian III* reversed the judgment entered by the court in *Meridian Prods. v. United States*, 40 CIT __, 180 F. Supp. 3d 1283 (2016) ("*Meridian II*") and remanded the case to the Court of International Trade for further proceedings.  As directed by the Court of Appeals, the court issues this Opinion and Order to instruct Commerce on the issuance of a new administrative determination.

## I. BACKGROUND

    The background of this litigation is described in the prior opinions of the court and the opinion of the Court of Appeals.  *See Meridian Prods. v. United States*, 39 CIT __, __, 125 F. Supp. 3d 1306, 1308-09 (2015) ("*Meridian I*"); *Meridian II*, 40 CIT at __, 180 F. Supp. 3d at 1284-85; *Meridian III*, 890 F.3d at 1274-77.  As discussed in those opinions, plaintiff Meridian Products LLC ("Meridian") submitted a request to Commerce for a scope ruling (the "Scope Ruling Request") on January 11, 2013 on three types of Meridian's imported kitchen appliance door handles, identified as "Type A," "Type B," and "Type C" handles.  *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1308 (citing *Letter Requesting a Scope Ruling Regarding*

*Kitchen Appliance Door Handles*, C-570-968, A-570-967 (Jan. 11, 2013) (Admin. R. Doc.

No. 1), ECF No. 39 App. 2 ("*Scope Ruling Request*")).  Commerce issued its decision, the "Final

Scope Ruling," on June 21, 2013, in which Commerce interpreted the scope of antidumping and

countervailing duty orders (the "Orders")[1] to include all three handle types.  *Final Scope Ruling*

*on Meridian Kitchen Appliance Door Handles,* C-570-968, A-570-967 (June 21, 2013) (Admin.

R. Doc. No. 34), ECF No. 25-1 ("*Final Scope Ruling*").  The Type A and Type C handles, which

are one-piece appliance door handles fabricated from a single aluminum extrusion, are no longer

at issue in this litigation, *Meridian I* having sustained the Department's decisions in the Final

Scope Ruling placing them within the scope of the Orders and *Meridian III* having been limited

to the issue raised by the Type B handles.  *See Meridian III*, 890 F.3d at 1276 (citing *Meridian I*,

39 CIT at __, 125 F. Supp. 3d at 1310-12).  This Opinion and Order, therefore, addresses only

the Type B handles, which do not consist entirely of an aluminum extrusion.

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2012), which grants this Court jurisdiction over civil actions brought under

section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, *as amended* ("Tariff Act"), 19 U.S.C.

§ 1516a(a)(2)(B)(vi) (2012).  In reviewing the contested scope ruling, the court must set aside

"any determination, finding, or conclusion found . . . to be unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  *Id.* § 1516a(b)(1)(B)(i).

---

[1] The scope language in both orders is essentially the same. *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650-51 (Int'l Trade Admin. May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653-54 (Int'l Trade Admin. May 26, 2011) ("*CVD Order*").

The "Type B" handle consists of a component fabricated from an aluminum extrusion, two plastic "end caps," and two screws, each of which attaches a plastic end cap to the aluminum component.  *See Final Scope Ruling* 2.  The Scope Ruling Request described a Type B handle as "an assembly of the middle handle bar extrusion piece plus two plastic injection-molded end caps at each end."  *Scope Ruling Request* 2.

In *Meridian I*, the court held that Type B handles were not described by the general scope language of the Orders, i.e., the scope language apart from the several specific exclusions. *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1314, 1318.  The court concluded that this language, under which an extrusion "is a shape or form produced by an extrusion process," did not, as a general matter, describe an assembly, opining that "no scope language in the Orders is so open-ended as to sweep into the scope all assembled goods that contain one or more aluminum extrusions as parts."  *Id.*, 39 CIT at __, 125 F. Supp. 3d at 1312 (internal citations omitted). While the scope language contains a provision—the "subassemblies" provision—that places within the scope of the Orders aluminum extrusion components of some assembled articles, the subassemblies provision is expressly limited to "partially assembled merchandise."  *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  The subassemblies provision states that, except for a good satisfying a specific exclusion (the "finished goods kit" exclusion),[2] "[t]he

---

[2] The "finished goods kit" exclusion reads as follows:

The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit."  A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product.  An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, *etc*. in the packaging with an aluminum extrusion product.

(continued…)

scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or

fasteners) to form subassemblies, *i.e.*, partially assembled merchandise." *AD Order*, 76 Fed.

Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  Under this "subassemblies" provision, the

scope includes only the components within an assembly that are aluminum extrusions and thus

"does not include the non-aluminum extrusion components of subassemblies." *AD Order*,

76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  *Meridian I* reasoned that this

provision, in any event, did not describe the Type B handles, which the Scope Ruling Request

stated were imported in assembled form and which Commerce found to be ready for use as is at

the time of importation.  *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1313 (citing *Final Scope

Ruling* 13).

      *Meridian I* also opined that even were the Type B handles described by the general scope

language, they would be placed outside the Orders by the "finished merchandise" exclusion.  *Id.*,

39 CIT at __, 125 F. Supp. 3d at 1315-16.  This exclusion applies to "finished merchandise

containing aluminum extrusions as parts that are fully and permanently assembled and completed

at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture

frames with glass pane and backing material, and solar panels." *AD Order*, 76 Fed. Reg.

at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  Concluding that "the Department's

determination . . . is not based on reasonable interpretations of the general scope language and

the finished merchandise exclusion," *Meridian I* remanded the Final Scope Ruling to Commerce

for reconsideration.  *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1316, 1318.

(continued…)

*AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

In its determination upon remand (the "Remand Redetermination"), Commerce asserted

that its Final Scope Ruling was correct but, to comply with the court's decision in *Meridian I*,

decided under protest that the Type B door handles were not included in the scope of the Orders.

*See Final Results of Redetermination Pursuant to Court Remand* 1, 7-15 (Mar. 23, 2016)

(Remand Admin. R. Doc. No. 4), ECF No. 67.   The court affirmed the Department's

determination that Type B handles were not included in the scope of the Orders.   *Meridian II*,

40 CIT at __, 180 F. Supp. 3d at 1292.   Following this decision, the Aluminum Extrusions Fair

Trade Committee, defendant-intervenor in this case, appealed the judgment in *Meridian II* to the

Court of Appeals.

In *Meridian III*, the Court of Appeals held that *Meridian I* was incorrect in concluding

that the Type B handles were not described by the general scope language of the Orders.

*Meridian III*, 890 F.3d at 1280-81.   *Meridian III* ruled that Commerce permissibly decided that

that the presence of the plastic end caps did not remove the Type B handles from the scope

because Commerce acted reasonably, and in accord with record evidence, in concluding that

these end caps were "fasteners."   *Meridian III*, 890 F.3d at 1278-80.   The Court of Appeals

disagreed with the reasoning in *Meridian I*, 39 CIT at __, 125 F. Supp. 3d at 1313, that because

the only scope language references to fasteners were in the subassemblies provision and the

finished goods kit exclusion, Commerce had erred in disregarding the presence of the plastic end

caps—on the ground that they were "fasteners"—in concluding that the Type B handles fell

within the general scope language.   The Court of Appeals opined that "[a]lthough a description

of fasteners only appears in the 'finished goods kit' scope exclusion, the 'finished goods kit'

language informs what may constitute a fastener in the context of the scope of the antidumping

duty order as a whole."   *Id.* at 1279.   *Meridian III* also held that Commerce correctly had

concluded in the Final Scope Ruling that the Type B handles were not excluded from the Orders

by operation of the finished goods kit exclusion. *Id.* at 1281.

Although it reversed the holding in *Meridian I* as to the general scope language and,

accordingly, vacated the judgment in *Meridian II* sustaining the Remand Redetermination,

*Meridian III* did not hold that the Final Scope Ruling necessarily was in accordance with law.

Specifically, the Court of Appeals did not sustain the Department's determination in the Final

Scope Ruling that the finished merchandise exclusion did not apply to the Type B handles. As

the Court of Appeals explained: "Because it is unclear from the record before Commerce and the

statements made by Meridian's counsel in its reply brief and at oral argument before this court

whether the Type B handles are fully and permanently assembled at the time of entry, we remand

for Commerce to clarify this point." *Id.* at 1281-82 (footnote omitted).

The uncertainty the Court of Appeals identified as to whether the Type B handles are

imported in assembled or unassembled form is understandable, in particular because the Final

Scope Ruling itself can be read to be inconsistent on this issue. At one place in the document,

Commerce stated that "the record is undisputed that the aluminum extrusion parts are not fully

and permanently assembled with non-aluminum extrusion parts at the time of entry." *Final

Scope Ruling* 13. Because Commerce made this statement in describing "Meridian's products,"

*id.*, it is possible, but not certain, that Commerce intended to describe not only the Types A and

C handles, which consist entirely of a fabricated aluminum extrusion, but also the Type B

handles, which do not. Nevertheless, in the next paragraph Commerce, again referring to all

three types, referred to "the fact that the products at issue are ready for use 'as is' at the time of

importation." *Id.* This statement indicates that Commerce may have considered the Type B

handles to have been imported in assembled form. The Court of Appeals was aware of this

inconsistency as it appeared in the Final Scope Ruling, and elsewhere in the record, and

expressly cited the statement in the Scope Ruling Request describing a Type B handle as "an assembly of the middle handle bar extrusion piece plus two plastic injection molded end caps at each end." *Meridian III*, 890 F.3d at 1281 n.8 (internal quotation marks and citation omitted).

The finding in the Final Scope Ruling that "the aluminum extrusion parts are not fully and permanently assembled with non-aluminum extrusion parts at the time of entry" was the reason Commerce gave for concluding that Meridian's handles, including the Type B handles, did not qualify for the finished merchandise exclusion. *Final Scope Ruling* 13. As the Court of Appeals implicitly recognized, this rationale cannot suffice if the Type B handles are fully and permanently assembled at the time of entry. Accordingly, *Meridian III* directed that "[i]f Commerce determines that the Type B handles are imported unassembled, then its original scope ruling controls and the inquiry ends" and that "[i]f Commerce determines the Type B handles are imported fully and permanently assembled, then we direct Commerce to address the question of whether the Type B handles are excluded from the scope of the antidumping and countervailing duty order as 'finished merchandise.'" *Meridian III*, 890 F.3d at 1282. The court addresses each of these possibilities below.

Should Commerce determine, based on substantial record evidence, that the Type B handles are entered in fully assembled form, then it must determine the applicability of the finished merchandise exclusion to the Type B handles in conformity with *Meridian III* (as that decision requires), but it also must do so in conformity with another decision of the Court of Appeals. A precedential decision, issued the day after *Meridian III*, interpreted the scope language of these same Orders in considering an appliance door handle that is highly similar to the Type B handle. In this subsequent opinion, the Court of Appeals held that "[w]ith respect to the exclusions from the Order's scope . . . the exception for fasteners unambiguously applies only to the finished goods kit exclusion and not to the finished merchandise exclusion."

*Whirlpool Corp. v. United States*, 890 F.3d 1302, 1311 (Fed. Cir. 2018) ("*Whirlpool*"); *but see*

*Whirlpool Corp. v. United States*, 890 F.3d 1302, 1312-13 (Reyna, J. dissenting).  *Whirlpool* did

not overturn *Meridian III*, and the court accordingly interprets the two appellate decisions

consistently.  The fasteners exception in the finished goods kit exclusion "informs what may

constitute a fastener in the context of the scope of the antidumping duty order as a whole" when

the question is whether a good falls within the general scope language, i.e., the language apart

from the specific exclusions.  *Meridian III*, 890 F.3d at 1279.  But the fasteners exception

properly may not be construed to limit the applicability of the finished merchandise exclusion.

*Whirlpool*, 890 F.3d at 1311.  Therefore, in order to comply with the holding of *Whirlpool*,

Commerce may not reach a determination that the finished merchandise exclusion is inapplicable

on the ground that some or all of the non-aluminum-extrusion components of a Type B handle

are considered by Commerce to fall within the meaning of the term "fasteners."  *See Whirlpool*,

890 F.3d at 1311 & n.4.  Rather, as required by the express terms of the finished merchandise

exclusion, Commerce must determine that the Type B handles are not within the scope of the

Orders if they are found to be "finished merchandise containing aluminum extrusions as parts

that are fully and permanently assembled and completed at the time of entry."  *AD Order*, 76

Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

Should Commerce validly determine, based on substantial record evidence, that the

Type B handles are entered in unassembled form, the "original scope ruling controls."

*Meridian III*, 890 F.3d at 1282.  But in that event, another issue requires clarification.  The court

considers the Final Scope Ruling to be unclear as to whether Commerce would consider the

entire unassembled Type B handle, or only the extruded aluminum center component, to be

merchandise that is subject to the Orders.  If Commerce concludes that the Type B handles are

entered in unassembled form, it must clarify this point in its new redetermination and in doing so

must address the scope language providing that "[t]he scope does not include the non-aluminum

extrusion components of subassemblies or subject kits." *AD Order*, 76 Fed. Reg. at 30,651;

*CVD Order*, 76 Fed. Reg. at 30,654.

The same lack of clarity would affect the Final Scope Ruling even if the Type B handle

were considered to be in assembled form at the time of entry yet somehow still be considered by

Commerce to be within the scope of the Orders.  Should Commerce decide in its new

redetermination that the Type B handle is in assembled form at the time of entry yet is still

within the scope of the Orders, Commerce in explaining such a decision would need to clarify

whether it is the extruded aluminum component or the entire handle that Commerce considers to

fall within the scope.

### III.  CONCLUSION AND ORDER

In conformity with the mandate of the Court of Appeals, upon consideration of all papers

and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Department's March 2016 Remand Redetermination be, and hereby
is, vacated; it is further

**ORDERED** that Commerce shall file, within ninety (90) days of the date of this Opinion
and Order, a new determination upon remand ("Second Remand Redetermination") that
determines, according to substantial evidence on the administrative record, whether Meridian's
Type B handles are fully and permanently assembled at the time of entry; it is further

**ORDERED** that if Commerce determines, based on substantial evidence on the
administrative record, that the Type B handles are fully and permanently assembled at the time
of entry, it shall determine whether the Type B handles qualify for the "finished merchandise"
exclusion, shall do so consistently with the holdings of *Meridian III* and *Whirlpool*, and shall
provide an explanation of its reasoning; it is further

**ORDERED** that if Commerce determines, based on substantial evidence on the
administrative record, that the Type B handles are in unassembled form at the time of entry, or if
it otherwise determines that the Type B handles are within the scope of the Orders, it shall
determine whether the Type B handles in the entirety, or only their extruded aluminum
components, are within the scope of the Orders; it is further

**ORDERED** that plaintiff, plaintiff-intervenor, and defendant-intervenor may file comments on the Second Remand Redetermination within thirty (30) days from the date on which the Second Remand Redetermination is filed; and it is further

**ORDERED** that defendant may file a response to the comments within fifteen (15) days from the date on which the last comment is filed.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: <u>January 14, 2019</u>
         New York, New York